PETROLEUM RECTIFYING CO. OF CALIFORNIA v. REWARD OIL CO.

(District Court, N. D. California, S. D. June, 1918.)

No. 302.

1. PATENTS ⊜⟶157(2)—CONSTRUCTION TO GIVE VALIDITY.
   Every patent should, if it may, be so construed as to secure to the patentee a monopoly of what he actually invented or discovered.
2. EVIDENCE ⊜⟶571(6)—PATENTS — SUIT FOR INFRINGEMENT — EXPERT EVIDENCE.
   On the issue of infringement proof of facts may not be met solely by expert speculation.
3. PATENTS ⊜⟶231, 241—INFRINGEMENT—IDENTITY OF RESULTS.
   Identity of results obtained, irrespective of process or apparatus employed, is not proof of infringement.
4. PATENTS ⊜⟶328—INFRINGEMENT—PROCESS AND APPARATUS FOR DEHYDRATING OIL.
   The Cottrell and Speed patents, No. 987,115 and No. 987,116, for process and apparatus for dehydrating oil, *held* not infringed by an apparatus which operates on a different theory.

In Equity. Suit by the Petroleum Rectifying Company of California against the Reward Oil Company. Decree for defendant.

Decree reversed 260 Fed. 177, —— C. C. A. ——.

John H. Miller, of San Francisco, Cal., for plaintiff.
William K. White, of San Francisco, Cal., for defendant.

NETERER, District Judge. Complainant seeks to enjoin the use by the defendant of a process and apparatus for dehydrating oil, claiming it to be an infringement of claims 1, 2, 3, 4, and 7 of process patent No. 987,115, and of claim 1 of apparatus patent No. 987,116, owned by complainant.

The defendant denies infringement; denies that the patents are valid; and alleges affirmatively that annihilation of emulsive condition by means of electric current is old in the art.

A claim does not seem to be asserted that the application of electric current to emulsive condition is new in the art. The Davis and Parrett patent of prior issue is an application of electric current to emulsive condition, but for a different purpose.

[1] Every patent should be construed, if it may be, so as to preserve to the patentee the privilege which the law grants to an inventor. Justice Brown, in Topliff v. Topliff, 145 U. S. 156, 171, 12 Sup. Ct. 825, 831 (36 L. Ed. 658), said:

"The object of the patent law is to secure to inventors a monopoly of what they have actually invented or discovered, and it ought not to be defeated by a too strict and technical adherence to the letter of the statute, or by the application of artificial rules of interpretation."

And mere rigid technicalities are not to be resorted to by courts to avoid inventions. Brush Electric Co. v. Electric Imp. Co. (C. C.) 52 Fed. 965, 974.

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[2] In the consideration of a charge of infringement it must not be forgotten that the burden of establishing infringement is upon the party charging infringement. It is a question of fact, and must be established by clear and convincing testimony, and proof of the fact may not be met solely by expert speculation. As was said by Judge Buffington in Fried. Krupp Aktien-Gesellschaft v. Midvale Steel Co., 191 Fed. 588, 591, 112 C. C. A. 194, 197:

"The absence of actual fact proof is not met by the presence of expert speculations, no matter how voluminous."

Nor can a theory which has not been reduced to an operative relation support claim for patent. As was well said by Judge Coxe in Lovell v. Seybold Mach. Co., 169 Fed. 288, 290, 94 C. C. A. 578, 580:

"Claims should cover what the patentee has invented and not what he imagines he has invented."

[3] Nor can infringement be predicated on results obtained irrespective of process or apparatus employed. As was said in Marconi Wireless Telegraph Co. v. Kilbourne & Clark Mfg. Co. (D. C.) 239 Fed. 328, 354:

"The mere fact that the same result is obtained by the operation of an apparatus is not conclusive of infringement. Infringement cannot be predicated on results obtained, irrespective of the apparatus employed. The fact that the apparatus of the plaintiff, by 'broad tuning,' and the apparatus of the defendant in normal operation, secure the same result, does not signify infringement. * * * Results accomplished by mode of operation or function, separate from the means of mechanical devices, do not constitute infringement. * * *"

[4] The issue here is not complicated. The testimony consumed less than a week. The treaters operated under the patents of the respective parties at the several plants were visited by court and counsel, and the operation of the respective treaters observed. The treaters in operation were not identical with the apparatus described in the several patents. The testimony, however, related to the respective treaters in the present condition of operation, and it seemed to me the issue upon the trial was between the process and apparatus as employed. It was apparent upon the trial and there still is a certain mystery which does not seem to have yielded to scientific explanation with relation to just what does take place in the emulsion when the surface tension that keeps the individual particles of water apart is disrupted.

The plaintiff contends that the emulsion is subjected to the action of a powerful electric field, whereby the particles constituting the inner phase of the emulsion are caused to coalesce into larger masses, whereby they are easily separated from the oil. "The action is believed to be electrostatic or thermal." The defendant contends that the surface tension which keeps the individual particles of water apart are disrupted by electrolytic action in the electrostatic field.

The treater of both parties is cylindrical in shape, about nine or ten feet deep, and perhaps three feet in diameter. In the plaintiff's treater, mounted upon a shaft in the center, is a rotating electrode,

designed to prevent short-circuiting between the electrodes, due to the formation of chains of water globules, by agitating or stirring the emulsion, and thereby limit, retard, or break up the formation of the chains of water globules. The electrode in the defendant's treater consists of a number of discs of like size placed in the center of the treater, mounted upon a stationary shaft, which is suspended near the top of the treater upon insulated supports. These supports are immersed within the body of the oil under treatment. These electrodes are nonadjustable; are 19 inches in diameter; the opening of the annular length of the outer electrode is 18 inches in diameter. The distance from one outer electrode to the next is 18 inches. The electrode is so placed as to be one-half the distance, the spacing being uniform between each electrode.

Both treaters use the same high-tension current, apply apparently the same kind of treatment, differing in the mechanical formation of the electrodes. The emulsified material enters the plaintiff's treater at the top, through a pipe, and the downflow of the material operated upon by the rotating electrodes prevents the formation of chains of water globules, preventing short-circuiting between the electrodes; the first action of the emulsion, free from other influences, being the alignment of the water particles without coalescence, and the alignment of these various water particles into a chain makes a path of less resistance, short-circuiting the electric current.

The mode of operation of defendant's apparatus provides for an upward flow of the emulsion through the treater for the purpose of encouraging short-circuiting; a quiet flow, without churning action, being conducive of a coalescence of the water globules in the electrostatic field, inducing electrolytic action.

Much was said in the trial and upon argument as to what is meant by the term "short-circuiting." Without going into an extended discussion, I do not think that there can be any doubt, from the history of the patents, the language employed in the several patents, and the operation of the treaters, that the patentees meant electrolytically conducting chains without regard to the permanency of such chains or of the short circuits formed thereby. There is no doubt in my mind, from the evidence and observation of the several treaters, and the language employed in the patents, that it was the purpose and intent of the patentees of complainant's patents, and considered an essential step, to prevent the formation of complete chains connecting the electrodes, and thereby create a short circuit. In other words, the plaintiff's process was to obviate electrolytic conduction and to maintain the electrostatic field. Electrolytic conduction is incompatible with the maintenance of such field. Every intendment of the language employed in claims 1, 2, 3, and 4 in issue is conclusive, as each concludes with the statement: "At the same time prevent the coalescing globules from forming complete chains, short-circuiting the electrodes." And this is further emphasized by the rotating electrode apparatus provided by patent No. 987,117, and which is now in use on the plaintiff's treater, and was viewed at the time of the trial, in which it is stated:

"The usual processes of settling, and of centrifuging, are not wholly effective, and that of distillation is expensive and not entirely practical; hence the process disclosed in said former application (patent 987,115), which process for the better understanding of the present improvement need only be briefly stated as consisting in subjecting the emulsion to the action of a powerful electric field, by bringing it between highly charged electrodes, whereby the particles constituting the inner phase of the emulsion are caused to coalesce into larger masses, which may then be easily separated out, thus fulfilling a useful purpose in the art. In said former application the importance of preventing the formation of short-circuiting chains of particles was emphasized by pointing out the danger of allowing the active surfaces of the electrodes to emerge from the liquid, or even to come too close to the surface, for in such case there is a tendency for the partially agglomerated water to collect in the surface layers and cause short-circuiting of the electrode; also, by calling attention to the downflow of the material, which course prevents short-circuiting by obviating the danger of an accumulation of water-rich masses; and also by stating that in order to prevent the formation of short circuits within the liquid, due to chains of water globules forming from one electrode to the other, it is necessary to prevent the potential difference between the electrodes from falling too low. Our present improvement has to do with this important feature of preventing short-circuiting between the electrodes due to the formation of chains of water globules, and our invention may be stated to consist in a process of this general nature, wherein the emulsion, while passing through the electric field, is throughout its entire course agitated or stirred, in order to avoid short-circuiting by limiting, retarding, or breaking up the formation of the chains of water globules."

To my mind the conclusion is inevitable that the process of the defendant operates differently from the process of the plaintiff. If English language means anything, then the process of the plaintiff is electrostatic or thermal, without electrolytic action, while that of the defendant is electrolytic in the electrostatic field. There is no substantial identity, because that of the defendant expressly includes that which the plaintiff expressly excludes. I also think the testimony is practically conclusive that the treaters of the plaintiff, constructed pursuant to the specifications of plaintiff's patent in issue, were not of commercial or operative value, with the possible exception of some oils or emulsions. The testimony of the witnesses in support of such contention is strongly supported by the fact that the wetted septum arrangement provided for and disclosed in patent No. 987,114 was installed to take the place of one of the apparatuses in the two patents in issue, and also by the subsequent introduction of the operative rotating electrode apparatus covered by patent No. 987,117.

Claim 7 is limited to passing the material to be treated between the charged electrodes, *substantially as described* (italics ours), preventing the formation of complete chains of water globules, this being essential to the operativeness of the process covered by claim 7, and has the same status as claims 1, 2, 3, and 4. The novelty of claim 1 of apparatus patent No. 987,116 consists in placing the insulated support for the electrodes entirely out of contact with the liquid undergoing treatment, and in the defendant's apparatus the inner electrode is entirely below the surface of the liquid under treatment. Plaintiff has not sustained the burden imposed nor brought itself within the law applicable to the issue.

An order may be taken dismissing complainant's bill.